UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO: 1:04CV-145-R

KENTUCKY WATERWAYS ALLIANCE,
et. al.,                                                                    PLAINTIFFS


v.


STEPHEN L. JOHNSON, et. al.,                                     DEFENDANTS


**MEMORANDUM OPINION**

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment on

Count III of the Amended Complaint (Docket 40).  Defendant, Environmental Protection

Agency, has responded to the Plaintiffs' motion, and has filed a Cross-Motion for Summary

Judgment (Dockets 49 & 50).  Defendant, Commonwealth of Kentucky, has also responded to

the Plaintiffs' motion, and has filed a Cross-Motion for Summary Judgment (Dockets 52 & 53).

Intervening Defendants, Kentucky League of Cities and Kentucky Coal Mining Association,

have both responded to the Plaintiffs' motion, and have submitted cross-motions for summary

judgment in opposition to Plaintiffs' motion for summary judgment (Dockets 47 & 48, and

Dockets 58 & 59, respectively).  Additionally, intervening Defendants Associated Industries of

Kentucky and the Kentucky Chamber of Commerce have filed a joint response to the Plaintiffs'

motion, and submitted a cross-motion for summary judgment (Dockets 56 & 57).  The Plaintiffs'

have replied to the collective Defendants' responses, and have responded to the Defendants'

respected cross-motions for summary judgment (Dockets 64 & 65).  Defendants Environmental

Protection Agency, Commonwealth of Kentucky, and Kentucky Coal Association have all

replied to the Plaintiffs' response to their respected cross-motions for summary judgment

(Dockets 71, 69, and 73, respectively).  Additionally, intervening Defendants Kentucky League of Cities, Associated Industries of Kentucky, and Kentucky Chambers of Commerce have all replied to the Plaintiffs' response to their respected cross-motions for summary judgment (Dockets 72 & 74, respectively).  This matter is now ripe for adjudication.  For the following reasons, the Plaintiffs' Motion for Summary Judgment is **DENIED**, the Defendants' Cross-Motions for Summary Judgment are **GRANTED in part** as to the merits of the eleven (11) Tier II antidegradation procedures in question, and Defendant-Interveners Associated Industry of Kentucky and Kentucky Chamber of Commerce's joint motion as to the statute of limitations is **DENIED**.

## BACKGROUND

### 1. The Clean Water Act and Tier II Antidegradation Policy

The Plaintiffs, Kentucky Waterways Alliance ("Waterways") seek summary judgment against the Defendants asserting that Defendant United States Environmental Protection Agency ("EPA") acted arbitrarily and capriciously when it approved the Commonwealth of Kentucky's Tier II Antidegradation Rules as required by the Clean Water Act ("CWA"), 40 C.F.R. §131.12(a)(2).  As part of maintaining consistent water quality standards under the CWA, each state must establish a antidegradation policy that must maintain and protect:

> 1) existing instream water uses; 2) existing water quality where it exceeds levels necessary to support propagation of fish and recreation, unless the state finds, after full public participation, that allowing lower water quality is necessary to accommodate important economic or social development in the area where the waters are located; and 3) high-quality waters that constitute an outstanding national resource, such as waters in national or state parks.

Mark A. Ryan, *The Clean Water Act Handbook*, 2nd Edition, 2003, at 31-32.  The implementation of an antidegradation policy by a state must ensure that existing water quality is

protected. *Id.*  To achieve this, the CWA and federal regulations require that states implement water quality standards consistent with 40 C.F.R. §131.12, which divides antidegradation into three tiers, including Tier II, at 40 C.F.R. §131.12(a)(2).[1]

Tier II protection applies to "high quality" waters whose conditions are better than required to support fish, shellfish and wildlife both in and on the water.  States establish their own methods, which must be approved by the EPA, to identify what waters in their state are given Tier II protection.  States may identify these waters based on two approaches proscribed by the EPA, including a "pollutant-by-pollutant" approach or a "water body-by-water body" approach.  Thus, Tier II protected waters have better water quality than some other categorized waters, and therefore may receive the release of additional pollutants in their waters that affect the waters' "assimilative capacity" to sustain the propagation of aquatic life, so long as the waters continue to meet their uses.  Every time a State permits new pollutants or "discharges" into Tier II waters, a State must not only determine that lowering the water quality is necessary to "accommodate economic or social development," but must also receive a permit to do so from a state agency unless the release of a discharge is *de minimis*.

## 2. Kentucky Tier II Antidegradation Rules and Approval Process

Kentucky adopted its first antidegradation policy in 1979, and subsequently adopted its

---

[1] 40 C.F.R. §131.12(a)(2) states: "Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control."

3

implementation procedures in 1995; the EPA approved the implementation procedures in part in 1997.  In Kentucky, water quality conditions are divided into four categories for antidegradation review, including: 1) Outstanding National Resource Waters ("ONRWs"); 2) Exceptional Waters; 3) High Quality Waters; and 4) Impaired Waters.  Kentucky requires Tier II antidegradation review for "Exceptional" and "High Quality" waters.  In Kentucky, these waters represent around ninety (90%) percent of Kentucky's waters.  As mentioned, these waters have water quality better than needed to support, fish, shellfish and wildlife.

The EPA has authorized Kentucky to implement a permit program similar to the federal government, to allow Kentucky to give permission to parties to release discharges into protected waters.  The regulations that govern the permit program come from the Kentucky Pollution Discharge Elimination System ("KPDES").  To obtain a permit, a potential discharger files an application with Kentucky's Environmental and Public Protection Cabinet ("Cabinet").  The application submitted contains detailed characteristics of the proposed discharge, and the Cabinet determines whether the applications are complete and then determines whether to deny the permit or prepare a draft permit.

A draft permit contains all the proposed conditions, including the general conditions specified by the Kentucky regulations and the effluent limitations proposed to be included in the permit.  All KPDES permits must contain: technology based controls that reflect pollution reduction achievable through particular process and changes; and, when necessary, must contain stringent limitations representing that level of control necessary to ensure that the receiving waters of the discharge comply with applicable water quality standards.  Notice of a draft permit is given to the public and a public comment period takes place, where in some cases a trial may

be held.  After the public comment period, the Cabinet will either issue the permit with appropriate conditions or deny it.  The final decision of the Cabinet is subject to an administrative review in hearing pursuant to Kentucky Revised Statute ("KRS") 224.10-420(2). Additionally, judicial review is available in the Kentucky courts, and the EPA has the authority to object to state-issued permits.

### 3. Factual & Procedural Background

On August 7, 1997, the EPA disapproved part of Kentucky's antidegradation policy for Tier II waters.  The EPA determined that the selection criteria adopted by Kentucky for Tier II waters "were not sufficiently inclusive to meet the requirements of 40 C.F.R. §131.12," and suggested that Kentucky meet the requirements as listed in the CWA.  The Cabinet declined to adopt the suggested revisions at that time, and stated it would deal with them at the next triennial review process.  In December of 1999, the Cabinet adopted revisions to the state water quality standards, including regulations containing implementation methodology for antidegradation review.  However, the EPA once again did not accept the revisions submitted by the Cabinet because they failed to address the concerns noted by the EPA on their 1997 disapproval.

The Plaintiffs served notice, pursuant to the CWA, of their intent to file civil action under the citizen suit provision of the CWA on May 19, 2001, for the alleged failure of the EPA Administrator assigned to oversee Kentucky to perform a mandatory, nondiscretionary duty to establish a water quality standard implementing antidegradation requirements for Kentucky.  In November of 2002, the EPA proposed a federal antidegradation implementation policy for Kentucky to implement.  Following this proposal by the EPA, the Plaintiffs advised the EPA that they felt the proposal was inadequate, and they requested changes in order to make the standard

conform to the CWA.

On February 17, 2004, the Plaintiffs renewed their 60-day notice demanding that the EPA perform its duty to finalize Tier II antidegradation rules for Kentucky that comply with the CWA.  The Cabinet adopted a revised antidegradation regulation on September 8, 2004, and submitted it to the EPA for review on September 23, 2004.  However, two-days prior to the Cabinet submission to the EPA, on September 21, 2004, the Plaintiffs filed their complaint in this Court alleging that the EPA had failed to perform its mandatory duty to promulgate antidegradation implementation procedures for Kentucky.  The Plaintiffs moved for summary judgment on January 29, 2005, and now asks that the Court to order the EPA to promulgate antidegradation regulations for Kentucky within 30 days of reaching a decision.  On April 12, 2005, the EPA approved Kentucky's new and revised antidegradation implementation procedures.  The Plaintiffs initially sought judicial review on the EPA approval, but has since agreed to voluntarily dismiss those counts.  Defendant-Interveners Associated Industries of Kentucky and the Kentucky Chamber of Commerce argue in their joint motion that Waterways' claims as to the domestic sewage provision, the 50% provision, and Kentucky's identification of high quality Tier II waters are barred by the six (6) year statute of limitations in 28 U.S.C. §2401(a).  However, the pertinent issue remaining before this Court is whether the EPA's approval of Kentucky's antidegradation procedures is consistent with the CWA requirements; and, whether the EPA acted arbitrarily and capriciously when it approved those procedures.

**STANDARD**

In looking at a federal agency's interpretation of a statute that it administers, the Court

must first ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. v. NRDC*, 467 U.S. 837, 842 (1984).  If the statute is silent or ambiguous with respect to the issue, the Court must then determine whether the agency's interpretation was permissible under the statute. *Id.* at 843.  In dealing with an EPA decision, a Court "need not find that it is the only permissible construction that the EPA might have adopted, but only that [the] EPA's understanding of [the] very complex statute" was reasonable. *Chem. Mfrs. Ass'n v. NRDC*, 470 U.S. 116, 125 (1985) (in looking at the CWA).

When reviewing an approval by the EPA, the Court should accept the factual findings of the agency if those findings are supported by substantial evidence on the record as a whole. *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).  Particular deference is given by the Court to an agency with regard to scientific matters in its area of technical expertise. *Nat'l Wildlife Fed'n v. EPA*, 286 F. 3d 554, 560 (D.C. Cir. 2002).  Courts will not set aside a final agency action unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a); *Northeast Ohio Regional Sewer Dist. v. U.S. E.P.A.*, 411 F.3d 726, 731 (6th Cir. 2005).   In considering whether an agency rule is "arbitrary and capricious," the Court may consider whether the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.*  A reviewing Court should defer to the EPA's interpretation of its regulations unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of the evidence. To support his position, he must present evidence on which the trier of fact could find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.,* 90 F. 3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, Ky., 807 S.W.2d 476 (1991)." *Gafford v. General Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

8

**DISCUSSION**

The parties have submitted eleven (11) matters concerning Kentucky Tier II antidegradation procedures to be addressed by the Court.  The Court shall address each issue individually, taking into account the relevant arguments submitted by all interested parties.  However, the Court once again notes the limited scope through which the Court may review the decisions by the EPA, in that the Court may only look at their decisions and determine whether or not such decisions were arbitrary and capricious.  The Court may not act as a decision-maker on matters of environmental policy.  The Court will examine the merits as to the statute of limitations claims following the analysis of the Tier II antidegradation procedures.

**I. Kentucky Tier II Antidegradation Procedures**

*1. Whether the EPA acted arbitrarily and capriciously when it determined that Discharges with increased Pollutant Loadings of less than 20% will not significantly degrade Water Quality*

Kentucky regulations state that an antidegradation review is not required for "KPDES permit renewals and modifications that result in less than a twenty (20) percent increase in pollutant loading from the previously permitted pollutant loading."  Waterways asserts that the 20% exception is vague, and will allow substantial increased pollution in Exceptional and High Quality waters.  Essentially, Waterways argues that the Tier II rules approved by the EPA do not protect the assimilative capacity of the waters and cannot be justified as *de minimis* because the discharges permitted under the regulation would not be insignificant.

Tier II antidegradation review is required when the lowering of water quality causes significant degradation. 63 Fed. Reg. At 36783.  The EPA permits States to have Tier II

9

regulations that result in a *de minimis* lowering of the water quality. *Ohio Valley Environmental Coalition v. Horinko*, 279 F.Supp.2d 732, 769 (S.D.W. Va. 2003). Waterways contends that the 20% expansion will have more than a *de minimis* effect because the regulation has the potential to permit dischargers to increase pollution in the waters by more than 20% of the assimilative capacity if the Cabinet permits individual discharges of up to 10%. Waterways interprets the regulation as focusing on an individual discharge, rather than protecting assimilative capacity discharge, which the Plaintiffs argue is the goal of Tier II protection.[2]

In this instance, the EPA reviewed information on the Kentucky permit program and then examined its potential impact on receiving waters. Based on that analysis, as well as a letter sent by the Cabinet to the EPA that Kentucky would not issue permits or renewal permits that would consume more than 10% of the water's assimilative capacity, the EPA determined that the provision would result in no more than a *de minimis* discharge into Tier II protected waters, and therefore would not require a Tier II review because the discharge would be *de minimis*. In reaching this decision, the EPA reviewed more than sixty (60) possible discharge dilution scenarios, as well as the permit decisions the Commonwealth had made in a five-year period from 2000 through 2005. After that review, which included looking at 104 permit renewals for major discharges, the EPA began discussions with the Cabinet by looking at the assimilative capacity of the receiving waters, where the EPA found that no discharger that had increased its pollutant loading by less than 20% had used more than 10% of the assimilative capacity. The EPA interpreted this as evidence supporting the Kentucky provision that would result only in *de*

---

[2]Waterways offers an example of a lake, in which an individual discharge would be allowed under the current vague state of the regulation to discharge up to 10% of the assimilative capacity (1/10), thus leaving 9 parts left. The next individual discharger could then discharge up 10% of the remaining capacity. This trend could continue until the assimilative capacity of pollutants in the water would be well over 20% and very significant.

10

*minimis* effects on water quality.  Further, the Cabinet submitted a letter to the EPA stating that where the Cabinet had reason to believe that a permit renewal or modification would result in a greater 10% reduction of the assimilative capacity under the 20% proposed regulation, the Cabinet would conduct a Tier II review before issuing the permit.  The EPA also noted that all increases in which the 20% provision is likely applicable must go through the KPDES permit process and that antidegradation provisions are implemented through that process.  Based on all of this research and analysis, the EPA approved the provision.

Waterways argues that the approval by the EPA was arbitrary and capricious, and that the EPA cannot use the letter provided by the Cabinet as a reference in their determination arguing that Kentucky does not recognize promises made by administrative agencies under KRS §13A.130.  Waterways also cites *Northwest Environmental Advocates v. U.S. E.P.A.*, contending that the EPA cannot approve state rules under the CWA when it relies on a commitment by the state to do things not specified in the regulation. *Northwest Environmental Advocates v. U.S. E.P.A.*, 268 F.Supp. 2d 1255, 1268 (D. Ore. 2003).  Additionally, the Plaintiffs assert that even if the 20% provision is valid, the provision is still ambiguous.

Though Waterways argues that the statute is vague and that Kentucky prohibits memorandum such as the April 11, 2005 letter as serving as official interpretative policy, the focus of the inquiry into this matter is not on the regulation itself, but rather the process that the EPA used to approve the provision in order to determine whether or not that process was conducted in an arbitrary and capricious manner.  Further, contrary to the claims of Waterways that the EPA may not rely on the letter from the Cabinet when making its decision to approve the provision, other courts have permitted that very action by the EPA.  In particular, the Tenth

Circuit Court of Appeals, in *Defenders of Wildlife v. E.P.A.*, stated that:

> the letter from the [New Mexico] WQCC (Water Quality Control Commission) simply contained an interpretation of an ambiguous regulation such that it complied with the requirements of the CWA. The EPA then relied on that interpretation in determining that it would approve the regulation. Consequently, the EPA's reliance on the WQCC's interpretation contained in the letter cannot be characterized as an impermissible rewriting of the regulation or as involving 'a major substantive legal addition to a rule.' Therefore, the EPA did not act arbitrarily and capriciously in approving the regulation.

*Defenders of Wildlife v. E.P.A.*, 415 F.3d 1121, 1127-28 (10th Cir. 2005).

In the instant matter, similar to *Defenders of Wildlife*, the EPA has used an interpretation by the Cabinet to help it understanding in conducting its approval process.  The EPA relied on the letter and other information in eventually approving the regulation.  The letter, along with the thorough review conducted by the EPA that included checking past permit procedures and approvals, as well as looking at the instances where discharge capacity would and would not reach insignificant levels, demonstrates that the EPA did not act in an arbitrary an capricious manner when approving this provision adopted by the Cabinet.

The hypothetical offered by the Plaintiffs does not match the past and present statistics and criteria that would suggest the breadth of the discharge offered by Waterways in its lake example.  Further, as noted by the EPA, the KPDES permit process has checks that would require a thorough review containing appropriate control technology, public notice, and water-based effluent limitations based on the hypothetical provided by Waterways, which serve as further controls on any potential significant discharges.  The EPA also correctly notes that nothing in the language of 40 C.F.R. §131.12(a)(2) requires a State to establish a cumulative cap on *de minimis* impacts as contended by the Plaintiffs through their hypothetical, and the Court

will not insert such language into the statute.[3]

The Plaintiffs also argue that the case *Northwest Environmental Advocates* supports the notion that the EPA cannot rely on a state internal memorandum when approving an antidegradation review process.  In *Northwest Environmental Advocates*, the Federal District Court of Oregon found the EPA approval to be arbitrary and capricious because the EPA had failed to include specific time and place designations for salmonid rearing and bull trout in its approval process.  *Northwest Environmental Advocates* at 1267-68.  Thus, the Court in *Northwest Environmental Advocates* did not hold that the EPA acted arbitrarily and capriciously because it relied on a state memorandum.  As such, the approval by the EPA of discharges with increased pollutant loadings of less than 20% was not arbitrary and capricious.

**2. Whether the EPA acted arbitrarily and capriciously when it determined that the Default Limits for Domestic Sewage Discharges will not significantly degrade Water Quality**

The Kentucky antidegradation implementation procedures provide that Tier II antidegradation review is not required for permits for new or expanded domestic sewage discharges that contain limitations that are as stringent as the limitations provided in the CWA Tier II regulations.  In particular, Kentucky regulations set forth effluent limitations for pollutants commonly found in the wastewater from domestic sewage facilities.  The provision

---

[3]Waterways fails to take into consideration the entire process for receiving a permit, and instead focuses the bulk of its response/reply on the necessity of a cumulative cap, which the Plaintiffs argue without such a cap, *de minimis* discharges can aggregate and amount to a significant discharge.  The EPA found that nothing suggests that Kentucky would let this event occur, based on past records and analyses, and Waterways must look at the entire process when determining whether the regulation in question is consistent with the CWA, rather than a lack of a specific measure.  The 20% discharge in this matter differs from the discharge analyzed by the Court in *Horinko* because of the other measures in the instant matter that the Cabinet adopts that ensure the permit process protects the high quality of water, in particular the 10% limit and corresponding letter from the Cabinet.  Further, in Kentucky, the EPA has the authority to object to state-issued permits after they are issued if the EPA finds they are not consistent with CWA regulations.

permits a new and expanding domestic sewage discharger to be issued a discharge permit without having to undergo further antidegradation review.   Waterways argues that there is nothing in the CWA that provides any basis for this exemption because it cannot merely allow a *de minimis* discharge and are not necessary to accommodate important economic or social development.

The EPA states that when it reviewed the Kentucky implementation procedures, the EPA found that offering the discharger an option of stringent effluent limitations or a Tier II review was consistent with the CWA and EPA regulations because the ultimate goal was to minimize the water quality effects of the discharge.  The EPA evaluated the limitations used when applying for a KPDES permit for sewage discharge and found that the facilities discharge at the stringent levels used meant that there would not be a significant lowering of the water quality. Specifically, the EPA evaluated the limitations for discharges of carbonaceous biochemical oxygen demanding ("CBOD") pollutants, ammonia-nitrogen, total suspended solids, dissolved oxygen, residual chlorine and decal coliform bacteria, and determined that the Kentucky limitations allow the water to stay in the highest level of treatment technology for domestic discharges in Kentucky.  Essentially, the EPA found that these limitations will minimize any lowering of water quality without having to conduct a Tier II antidegradation review.  The EPA stated that the KPDES permitting process provides default limits that are the least stringent limits that exclude a facility from antidegradation review because Kentucky has implemented a policy that imposes more stringent limits or forbids discharges where the default limits are not adequately protective.  Thus, the EPA found that Kentucky has implemented its regulations consistent with Tier II antidegradation requirements.

Waterways asserts that despite the reasoning used by the EPA to reach its decision, increased discharges at the sanctioned levels would use far more than 10% of the capacity of the receiving waters.  Further, the Plaintiffs suggests that nothing in the statute would stop a domestic sewage discharger to use up to 100% of the assimilative capacity for cooper and iron. Waterways argues that the EPA has approved an exception that would allow new sewage treatment plants to discharge without limits into exceptional waters.

The objective of the CWA "is to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §1251(a).  With this objective in mind the EPA determined that the procedures set by the KPDES permitting system would achieve this objective without having to go through a Tier II antidegradation review.  The EPA reached this conclusion by looking at past statistics and measuring water levels in order to make their conclusions and approve the Cabinet process.  In contrast, Waterways has not looked at any of the pertinent data, but has instead offered speculations on what could happen worst case scenario, assuming that the KPDES would permit discharges of up 100% assimilative capacity of certain pollutants in certain hypothetical circumstances.  However, as noted by the EPA, speculation on the part of Waterways in looking at the regulation does not equal an arbitrary and capricious approval of the regulation by the EPA.  Contrary to the assertions by Waterways, EPA has offered justification for its approval because it evaluated the limitations used in the KPDES permit process, applied them to the pollutants in question, and in its judgment determined that they would minimize the lowering of water quality.  It found that any potential discharges would be *de minimis*, and such discharges are permitted by the EPA under Tier II review. *Horinko* at 769.  Accordingly, the EPA did not act arbitrarily and capriciously when it

determined that the default limits for domestic sewage discharges will not significantly degrade water quality.

### 3. Whether the EPA acted arbitrarily and capriciously when it determined that Discharges at a Default Level of one-half of otherwise Allowable Quality-Based limits are not likely to cause Significant Degradation of Water Quality

The Kentucky regulations permit a new or expanding non-domestic discharger to a high quality water to accept KPDES permit limits that are no more than one-half of the water quality-based limitations that would have been allowed at standard design conditions.  The EPA asserts that these regulations require no further Tier II antidegradation review because water quality-based effluent limitations, which the regulations ensure, make sure that the water quality criteria is met in the receiving waters.  Additionally, the EPA contends that if the permit applicant does not accept the effluent limitations within the regulations, the applicant would then have to request water quality-based effluent limitations that would otherwise be permitted under a Tier II antidegradation review.  The EPA states that it approved the provision based upon its analysis of Kentucky's permit history as well as a letter sent to the EPA on February 25, 2005 by the Cabinet, in which the Cabinet explained that their limits were twice as stringent as already conservative water quality-based effluent limits that result in no significant lowering of water quality.

Waterways argues that the exemption for industrial and other non-domestic discharges is irrational because the regulation allows dischargers to opt out of a Tier II review if they accept the permit limits in the regulation, and that the statute is ambiguous and would allow discharges to take up to fifty percent (50%) of the assimilation without any Tier II public showing of

16

necessity for the discharge because it lacks a cumulative cap on assimilative capacity. Waterways also offers another hypothetical to demonstrate the negative effects the regulation may have if implemented by the Cabinet. Further, Waterways contends that the record is not clear as to why the regulation does not require non-domestic dischargers to accept the effluent limits for CBOD, ammonia, total suspended solids, fecal coliform and phosphorus.

The EPA determined that the discharges meeting the limits stated in the regulation would likely not have greater than a *de minimis* impact on water quality because the EPA found that the fifty percent (50%) provision will preserve all or a significant amount of the receiving water's assimilative capacity. Additionally, the EPA determined that expansions for existing discharges to high quality water would lead to improved water quality downstream of an existing discharge for all expansions proposed at less than two times the existing loading of a pollutant because it would impose more stringent limits than the ones currently in place. The EPA also looked at the flow records for the waterways and flow conditions, and determined that the regulation would provide a lesser impact to water quality than that found at very low stream flows.

As mentioned, the EPA also reviewed past KPDES permits to determine how often facilities have been permitted to expand and estimate the potential number of expansions that may occur in the future. The EPA found that no discharges in Kentucky expanded by more than 100% from 2000 to 2005, leading the EPA to conclude that the fifty percent (50%) provision would not result in any lowering of the water quality from expanded discharges. The EPA also found that the provision preserves almost all remaining assimilative capacity, and would not result in a significant degradation of high quality waters. As such, the analysis by the EPA and their approval of the provision was not arbitrary and capricious.

In its initial argument, Waterways again attacks the validity of the statute rather than the analysis used by the EPA to approve the provision.  Rather than challenging the findings, Waterways attempts to show a potential for significant water degradation through a hypothetical, which goes to the content of the statute, rather than the EPA's analysis.  Further, Waterways does not address the EPA's contention that the limitations set up by the provision are sufficient and serve the overall purpose of the CWA by limiting water degradation and maintaining assimilative capacity without requiring a Tier II review.  The argument by Waterways that the exemption would not maintain assimilative capacity because it is not subject to a cumulative cap fails in light of the analysis by the EPA to look at the past permit distributions that showed no dischargers in Kentucky expanded by more than 100%.  The hypothetical also fails because, as argued by the EPA, the example assumes that allowable limits would be on assimilative capacity of the entire lake, rather than the mixing zone, which is considerably smaller than the assimilative capacity of the entire lake.  Accordingly, EPA did not act arbitrarily and capriciously when it determined that discharges at a default level of one-half of otherwise allowable quality-based limits are not likely to cause significant degradation of water quality.

### 4. Whether the EPA acted arbitrary and capricious when it determined that a POTW subject to a Regional Plan does not need Tier II Antidegradation Analysis

Kentucky's antidegradation policy provides that the approval of a publicly owned treatment works ("POTW") regional facility plan meets the requirements for an antidegradation review.  Waterways argues that the provision cannot substitute for a Tier II review because it does not require a show of public necessity as mandated by the CWA, but rather requires a plan

"in the best interest of the public."[4]  The EPA reviewed the on point regulations and determined that the components designed for a development of a regional facility plan in Kentucky meet the required decision making process under the CWA, and was in fact the equivalent of an antidegradation review.

Waterways' argument stems from the wording of the statute, but not the analysis by the EPA.  In reaching its decision the EPA looked at: the proposed project, which included historical compliance; a detailed evaluation of alternatives; a public participation process; and the effects of water quality.  Waterways does not address this analysis in its motion, and admits that the Cabinet approval does meet some of the same issues as antidegradation.  Further, as mentioned *supra*, nowhere in its motion does Waterways challenge the analysis used by the EPA to reach its decision to approve the regional plan.  Accordingly, the EPA did not act arbitrarily and capriciously when it determined that a POTW subject to a regional plan does not need Tier II antidegradation analysis.

### 5. Whether the EPA acted arbitrarily and capriciously when it determined that Antidegradation concerns are adequately addressed in the Issuance of Storm Water General Permits

Kentucky's implementation procedures provide that discharges subject to KPDES storm water general permits are not subject to Tier II antidegradation review.  Waterways argues that the EPA cannot approve Kentucky's decision to issue storm water general permits because the EPA has not taken into consideration neither the public participation nor social or economic necessity of the individual activities for each specific discharge as required by the CWA, but

---

[4]In their reply, the Plaintiffs concede that the actual language of the regulation, 401 KAR 5:006, makes the regional facility plan process closer to a Tier II review than the Plaintiffs initially believed when they filed their first motion for summary judgment.  Nonetheless, the Court will address the issues from the initial brief.

instead attempts to justify its decision based on *de minimis* effect arguments for storm water discharges.[5]  Waterways cites *Horinko* in support of its argument, asserting that under similar circumstances the Southern District of West Virginia District Court held that because 40 C.F.R. §131.12(a)(2) requires a showing of important economic or social necessity in order to avoid a Tier II antidegradation review for specific waters, that language implied a location specific permit and public participation process that could not be met based on the analysis done by the EPA to show where the discharges would take place. *Horinko*, 279 F.Supp 2d at 761-62.  In *Horinko*, the Court emphasized that the EPA had not explained how, before a State knew of where a discharge could took place, the discharge would accommodate an important economic or social development, or, how the State could hold meaningful public participation without the public being aware of what water body was in question. *Id.* at 761.

Since the holding in *Horinko*, the Seventh Circuit Court of Appeals addressed the public participation process involved in issuing general permits based on storm water discharge in *Texas Independent Producers and Royalty Owners Association v. E.P.A.*, 410 F.3d 964, 977-78 (7th Cir. 2005) ("TIPROA").  In *TIPROA*, the Court, in analyzing another section of the CWA, held that Congress has permitted the use of general permits, and upheld the EPA's interpretation of not needing a public hearing because it would go contrary to Congress' intention to allow for the use of general permits since the manner in which general permits are issued exposes it to some form of public scrutiny. *TIPROA* at 978.

The holding in *TIPROA* is counter to the reasoning used by the Court in *Horinko* because

_____

[5]Specifically, Waterways looks to the language of 40 C.F.R. §131.12(a)(2) that states "unless the state finds, after full public participation, that allowing lower water quality is necessary to accommodate important economic or social development in the area where the waters are located."

it does not require the EPA to elaborate on how public participation may be held when issuing general permits for storm water discharge.  The Sixth Circuit Court of Appeals has not addressed this particular matter.  Though this Court is not bound by either decision, the holding by the Seventh Circuit Court of Appeals provides more guidance in this instance because of its higher judicial authority and closeness in proximity to the instant matter.  Further, the Court in *TIPROA* abides by the standard to which this Court follows when looking at agency decisions by initially looking for congressional intent before analyzing whether or not the interpretation by the agency in question was arbitrary and capricious. *See Chevron U.S.A.*, 467 U.S. at 842.  As mentioned, the Court in *TIPROA* determined that Congress not only intended the use of general permits, but also implied that the public participation process would be satisfied through an issuance of a general permit.  Accordingly, the decision by the EPA was not arbitrary and capricious when it determined that antidegradation concerns are adequately addressed in the issuance of storm water general permits in regards to public participation.

In looking at whether or not the EPA has offered an explanation as to how a general permit for a discharge issued by the Cabinet that does not undergo a Tier II review could satisfy the social or economic accommodation requirement of 40 C.F.R. §131.12(a)(2), the Court must determine whether the EPA has offered a reasonable explanation that shows that a discharge was associated with an important economic or social interest.  In *Horinko*, the Court determined that the EPA had acted arbitrarily and capriciously because the EPA had not offered any explanation to address how a discharge could satisfy the socioeconomic necessity. *Horinko* at 762.  Here, in contrast to *Horinko*, the EPA has stated that the social and economic accommodations are addressed by the fact that the EPA has recognized the right of Kentucky to exercise its discretion

when assigning or renewing general permits and that any potential storm water discharges under the general permit would be a *de minimis* lowering of the water quality.  In *Horinko*, the Court recognized that the EPA had the authority to exempt *de minimis* changes in water quality from Tier II review. *Id.* at 769.

In the instant matter, the EPA has determined that the expanding storm water discharges into high quality waters by means of general permit would not cause a significant lowering of water quality.  As such, the discharges the storm water would be permitted under a general permit under the reasoning in *Horinko* because any changes to the water quality would be *de minimis*, and would therefore not require a Tier II review.  Further, the EPA has noted that should an applicant for a general permit fail to qualify for authorization to discharge or the Cabinet should deny the discharger the right to discharge under the general permit because the discharger may have water quality impacts that are more than *de minimis*, the discharger would then have to apply for a KPDES permit that would require a Tier II antidegradation review.  As mentioned *supra*, the EPA can rely on the commitment by a State when interpreting the application of its regulations. *See Defenders of Wildlife*, 415 F.3d at 1127-28.  Accordingly,  the decision by the EPA was not arbitrary and capricious when it determined that antidegradation concerns are adequately addressed in the issuance of storm water general permits in regards to social and economic accommodations.

**6. Whether the EPA acted arbitrarily and capriciously when it determined that under Kentucky Regulations Discharges associated with Coal Mining receive a Tier II Antidegradation Review consistent with the requirements of 40 C.F.R. §131.12(a)(2)**

Kentucky antidegradation regulations provide that coal mining discharges are subject to

regulation under the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §1201 and 33 U.S.C. §1344, and are not subject to Tier II antidegradation review.  The EPA asserts that it based its decision to approve the regulation because it determined that the existing programs under SMCRA represent a decision-making process consistent with Tier II review, and in a February 25, 2005 letter the Cabinet outlined the process for issuing permits for conducting antidegradation reviews related to coal mining that the EPA took as meeting appropriate water quality protection.

In the February 25, 2005 letter, the Cabinet explained the process for issuing permits and conducting antidegradation review related to coal mining, highlighting five steps, which the EPA used in making their decision to approve the regulation.  First, the Kentucky Coal Water task force establishes a coordination mechanism for considering the various analyses used under the KPDES permit program, which the EPA found would enhance the Cabinet's review of its coal mining decision as to whether the discharge is necessary and important.  Second, the Cabinet implements three different overlapping statutory and regulatory processes, which the EPA found will allow the Cabinet to evaluate alternatives and minimize environmental impacts consistent with the CWA.  Third, the Cabinet requires that KPDES applications for coal mining discharges include relevant socioeconomic information required for an antidegradation analysis.  Fourth, Kentucky will incorporate a public review and comment during the KPDES process, which would also include intergovernmental coordination between the public, state and federal agencies, which the EPA determined would satisfy the public participation requirement of the CWA.  Fifth, the EPA found that the final determination by the Cabinet ensures that discharges from coal mining activities will not occur until the Cabinet determines whether the discharge is

23

to a high quality water, and if so whether that activity is "necessary and important."  The EPA determined that this process incorporates the necessary considerations provided for under the EPA's antidegradation regulation because it is consistent with 40 C.F.R. §131.12(a)(2).

The pertinent section of 40 C.F.R. §131.12(a)(2) that the EPA argues is on point with the Cabinet permit process for coal mining states: "unless the state finds, after full public participation, that allowing lower water quality is necessary to accommodate important economic or social development in the area where the waters are located."  The EPA contends that the Kentucky process form approving coal mining discharge permits is consistent with the language of the CWA, and the Court agrees with the EPA.  The process established by Kentucky not only meets the requirements as described in 40 C.F.R. §131.12(a)(2) by allowing public participation as well as economic and social accommodation analysis, but also is consistent with the overall purpose of the CWA to maintain high quality water levels.

Waterways again asserts that the EPA cannot rely on a letter from the Cabinet when conducting its analysis to approve a regulation.  However, as determined *supra*, the EPA may rely on the letter from the Cabinet when making its decision to approve the provision. *See Defenders of Wildlife*, 415 F.3d at 1127-28.  Waterways further asserts that the permit process contradicts the plain language of the CWA.  However, as determined *supra*, the permit process for the Kentucky regulation is consistent with the language of 40 C.F.R. §131.12(a)(2).  Accordingly, EPA did not act arbitrarily and capriciously when it determined that under Kentucky regulations discharges associated with coal mining receive a Tier II antidegradation review consistent with the requirements of 40 C.F.R. §131.12(a)(2).

***7. Whether the EPA acted arbitrarily and capriciously when it determined that the process***

***established by Kentucky for permitting domestic sewage from Single-Family residences is***

***consistent with 40 C.F.R. §131.12(a)(2)***

The Kentucky regulations provide that domestic sewage discharges from single-family residences are not subject to Tier II review.  The EPA argues that the permit process established by the Cabinet is consistent with 40 C.F.R. §131.12(a)(2) because the requirements mandated by the KPDES permit that an applicant must abide by in order to qualify for coverage under a general permit.  A single-family household must first demonstrate that there are no alternatives to discharging, such as having access or a connection to a septic tank, lateral system or a larger sewer system.  Following this showing, the Kentucky Division of Water weighs the need for the proposed discharge, and also looks at the necessity for the protection of public health and water quality concerns that include a lower existing water quality or further impairment.  Lastly, the Kentucky Division of Water solicits public comments on the proposed permit requirements and qualifications for authorization under the general permit.

As noted *supra*, the pertinent section of 40 C.F.R. §131.12(a)(2) that the EPA argues is on point with the Cabinet permit process for permitting domestic sewage from single-family residences states: "unless the state finds, after full public participation, that allowing lower water quality is necessary to accommodate important economic or social development in the area where the waters are located."  The EPA contends that the Kentucky process of approving single-family residence discharge permits is consistent with the language of the CWA, and the Court agrees with the EPA.  The process established by Kentucky not only meets the requirements as described in 40 C.F.R. §131.12(a)(2) by allowing public participation as well as

25

economic and social accommodation analysis, but also is consistent with the overall purpose of the CWA to maintain high quality water levels.

Waterways argues that the permits for the single-family residence must undergo an antidegradation review because of the nature of the discharge, citing *Horinko* to support its position. *Horinko* at 758-59.  However, as correctly pointed out by the EPA, here, in contrast to *Horinko*, the Cabinet regulation requires that all new or increased domestic sewage discharges from single-family residences go through a permit process, whereas the West Virginia regulation exempted them. *Id.* at 757-59.  In the instant matter,  in order for any new applicant to receive the general permit in question, the applicant goes through a permit process consistent with the CWA because the regulation requires the Cabinet to evaluate socioeconomic accommodations and provide for public participation in all new and increased-discharge cases.  Waterways also asserts that the discharges are difficult to monitor and that plaintiffs have more alternatives than discharging into a waterway.  The Plaintiffs offer no evidence to support these assertions, and these charges go more towards the enforcement and circumstances surrounding the regulation, as opposed to the action of the EPA.  Accordingly, the EPA did not act arbitrarily and capriciously when it determined that the process established by Kentucky for permitting domestic sewage from single-family residences is consistent with 40 C.F.R. §131.12(a)(2).

### 8. Whether the EPA acted arbitrarily and capriciously when it determined that Concentrated Animal Feeding Operations do not need Antidegradation Review

Kentucky regulations provide that discharges from concentrated animal feeding operations ("CAFOs") are not subject to Tier II review.  CAFO facilities are regulated by either general or individual permits that allow no discharges at all except those that may occur from

significant rainfall.  Waterways argues that the "no discharge" policy found in these permits does not help Kentucky waters because pollution still subsides due to the non-point pollution from manure and other large scale livestock operations.  Waterways argues that the Kentucky regulations limit their consideration of pollution solely to point source discharges, and that this does not address the pollution from the non-point discharges.  Additionally, Waterways contends that the exception made for 25-year 24-hour rainfall may not be exactly what the public prefers, despite the infrequency of such rainfalls.

The EPA states that it approved the regulation because of representations from the Cabinet that Kentucky does not require a Tier II review because it does not intend to issue any new permits to dischargers who would allow discharges into any high quality or exceptional waters.  The EPA also states that though there cannot be any guarantees that no discharges will occur, the EPA states that discharges should be uncommon because discharges in question may only be permitted when precipitation (that even the Plaintiffs acknowledge is rare) causes an overflow.  The Cabinet has represented that it will ensure no significant lowering of water quality from CAFO sources.  Additionally, the EPA notes that for new sources no discharge shall be authorized under any circumstances.  The rarity of the precipitation as well as the fact that the regulation prohibits all other discharges demonstrates that CAFO sources will have no more than a *de minimis* effect on water quality.  As such, Waterways' arguments do not show that the EPA acted in an arbitrary or capricious manner in this instance.

In looking at the non-point discharges, the EPA correctly points out that non-point discharges are not subject to federal regulation, and therefore are not subject to antidegradation review. *Horinko* at 763; *American Wildlands v. Browner*, 260 F.3d 1192, 1197 (10th Cir. 2001);

27

*Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir.1976).  Whether a State wishes to impose requirements for non-point sources is a matter of state law. *Browner*, 260 F.3d at 1197. In applying this settled law to the instant matter, the non-point source arguments made by the Plaintiffs does not demonstrate that the EPA was unreasonable in making its decision to approve the regulation.  Accordingly, EPA did not act arbitrarily and capriciously when it determined that concentrated animal feeding operations do not need antidegradation review.

### 9. Whether the EPA acted arbitrary and capricious when it approved Kentucky's decision not to include Impaired Waters in its Tier II Category of Waters that would require Antidegradation Protection

Waterways asserts that the EPA contradicted the CWA by approving Kentucky's designational/water-body specific approach to antidegradation because a pollutant-specific approach is necessary under the CWA, and that pollutant-specific/pollutant-by-pollutant approach would include more waters for Tier II review that Kentucky categorizes as impaired waters.  The Plaintiffs further argue that even if the water-body specific approach is valid, the EPA approval of the Kentucky's rules was arbitrary and capricious.  Waterways argues that Kentucky should have approved a parameter-by-parameter/pollutant-by-pollutant approach rather than a water-body specific approach.

There are two approaches used to identify high quality waters: 1) water-body-specific/designational approach and 2) pollutant-specific/pollutant-by-pollutant approach.  The EPA has approved both approaches when categorizing high quality waters.  States that use a water-body-specific/water-by-water/designational approach to weigh a variety of factors in order to assess the overall quality of the water.  The determinations may be made before the Tier II

28

review or made during the course of evaluating a discharge.  Under the water-body-specific approach, assimilative capacity for a given pollutant may not be subject to Tier II protection if the segment is not deemed high quality, which, according to the EPA, provides broader protection than the pollutant-specific approach because it may preserve water quality where criteria for certain pollutants is not attained and by making an advance decision it facilitates implementation.  States that use a pollutant-by-pollutant approach determine whether water quality is better than the applicable criteria for a specific parameter or pollutant that would be affected by a new discharge or an increase of the existing discharge of the pollutant.  These determinations are generally made at the time of a permit application for a new discharge.

The EPA contends that it approved the Cabinet's decision to designate waters on a water body-specific basis because such a designation is consistent with EPA regulations that require states to support water levels necessary to sustain fish, shellfish and wildlife.  The EPA requires that such waters should receive consideration for high quality protection if the waters support both aquatic life-based uses and recreation-based uses.  The EPA holds that if the water is impaired for one of these uses, then a State may determine under a water-specific approach that the body of water does not fall into the category of a Tier II protected high quality water.  The EPA notes that under Kentucky's approach over 90% of state waters receive either Tier II or Tier III protection.  The EPA also found that the Kentucky regulation is consistent with the EPA's interpretation of the regulation.

As mentioned, Waterways contends that the use of water-body specific designations limits the protection against unnecessary pollution to exceptional and high quality waters counter to the goals of the CWA and in contrast to the plain language of 40 C.F.R. §131.12(a)(2).  In

29

particular, Waterways has issues with the language of the regulations between the words "level" and "quality" arguing that quality should be protected, not that levels should be sustained. Essentially, the Plaintiffs assert that the EPA's interpretation of their own regulation is inconsistent with the goals of the CWA.  The Plaintiffs also cite to the EPA handbook in arguing that a water body specific approach goes against EPA regulations; however, the Plaintiffs do acknowledge that the EPA has not always required a uniform parameter-by-parameter approach. Further, the Plaintiffs allege that Tier II protection should be granted to impaired waters.

Under the standard of review implemented by the Court, an agency, such as the EPA, receives considerable deference when interpreting its own regulations. *Auer v. Robbins*, 519 U.S. at 461.  In *Horinko*, the Court found that the EPA had not been arbitrary and capricious when it approved West Virginia's decision to implement a water body-specific approach, holding that:

> [t]he court is satisfied that the water body-by-water approach permits a State to make an overall classification of a particular water body without needed to make a classification for each individual pollutant, and that this approach has the benefit of allowing a State to focus its resources on overall high quality waters.

*Horinko* at 748.  When considering the standard by which the Court should review the interpretations by the EPA of its own regulations, as well as the case law that recognizes the use of a water body-specific approach, the Court not only finds the water-body specific approach valid, but also holds that the Kentucky rules are reasonable.

Over 90% of Kentucky waters receive Tier II or Tier III protection using the water body-specific approach approved by the EPA; this fact alone counters to the suggestion that the EPA's approval was irrational or unreasonable.  Further, rather than looking at the EPA approval process to determine whether or not the EPA acted reasonable, Waterways challenges the semantics of the Kentucky regulation, which has not seemed to hinder the progress of the state

30

and EPA to protect over 90% of Kentucky's waters.  The EPA properly examined the impact of

a water body-specific approach on Kentucky waters, and even determined that in some cases

waters that would not fall under protection using a pollutant-specific approach would be listed

under a water body-specific approach.  Additionally, the EPA receives considerable deference

from the Court when interpreting its statute, and in this instance, the EPA's interpretation is not

plainly erroneous to the regulation.  Lastly, the EPA correctly points out that Kentucky has

discretion to classify waters on a water body-specific basis, and Waterways has not supported its

contention that Kentucky irrationally limited its Tier II protections.  Contrary to what Waterways

asserts, the Court in *Horinko* recognized "the value of a State focusing its resources on high

quality waters and agrees with the EPA that the water body-by-water approach may be an

effective manner of achieving this benefit." *Horinko* at 748.[6]  The EPA correctly states that when

certain waters do not support both aquatic and recreational uses, the State does not have to list

them as Tier II protected waters. 40 C.F.R. §131.12(a)(2).[7]  Accordingly, the EPA did not act

arbitrary and capricious when it approved Kentucky's decision not to include impaired waters in

its Tier II category of waters that would require antidegradation protection because of the

widespread Tier II protection in place.

**10. Whether the EPA acted arbitrarily and capriciously when it determined that the Kentucky**

---

[6]The Court in *Horinko* noted that West Virginia had been demoting Tier II protected waters for only Tier I review. *Id.* at 748.  This differs from the instant matter, where the EPA and the Cabinet have determined that because of certain levels of pollutants the qualities of the waters in question listed by Waterways do not deserve Tier II review, thereby offering the "legitimate reasons" to support their classifications, which is that the waters in question do not support both aquatic life **and** recreational uses. *Id.* at 750.  Further, there is no evidence to support the claim by Waterways that the Cabinet regulations may leave over half of the waters of Kentucky unprotected.

[7]In pertinent part, the CWA states under 40 C.F.R. §131.12(a)(2): "Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife **and** recreation in and on the water, that quality shall be maintained and protected." (emphasis added).

*Regulations contain adequate Implementation Procedures*

Waterways argues that the EPA unreasonably approved the proposed Kentucky rules without addressing basic direction in regards to the implementation rules.  The EPA counters noting that the antidegradation regulations apply to discharges requiring KPDES permit review.  The antidegradation regulations provide guidelines that the state should follow in dealing with permit applicants.  *See* 401 KAR 5:030 §1(3)(b)(5).  The regulation then goes on to specify twelve (12) specific items to consider when issuing a permit.  Essentially, the applicant will seek a permit, submit the necessary paperwork, and the Cabinet will then consider whether it is approved or not approved based on the regulations.  The Court fails to see how the EPA acted arbitrarily and capriciously when it approved these implementation rules.  The EPA correctly notes that in *Northwest Environmental Advocates v. EPA*, the case offered by the Plaintiffs to support their assertion, the rules adopted by Kentucky offer much more than the one sentence provided by the state in that matter. *Northwest Environmental Advocates v. EPA*, 268 F.Supp.2d at 1265.  Accordingly, the EPA did not act arbitrarily and capriciously when it determined that the Kentucky Regulations contain adequate implementation procedures.

**11. Whether the EPA acted arbitrarily and capriciously when it approved Kentucky's Implementation Procedures for KPDES Permits even though the Procedures did not address CWA Section 401 Water Quality Certifications**

Waterways argues that the EPA improperly approved the Kentucky regulations without any rules to govern the Section 401 certification process and without an explanation as to how antidegradation would be handled by Kentucky decision makers.  The EPA counters that this claim has no merit, and that it is improper for the Plaintiffs to ask this Court to order the EPA to

32

direct Kentucky to fashion procedural rules to satisfy its obligations under Section 401(a).  The

Court agrees with the EPA that the claim brought by the Plaintiffs lacks merit because Kentucky

already has a procedure to issue 401 certifications for permits, which comes from the Corps of

Engineers under CWA Section 404. *See* KRS 224.16-050(2).  Additionally, Kentucky's

antidegradation policy provides that Kentucky must maintain quality of its waters when granting

CWA Section 401 certifications. *See* 401 KAR 5:029.  Thus, even though Kentucky chose to

focus their implementation procedures on KPDES permits, the Kentucky regulations still apply

to water quality certifications as required under the CWA, and the EPA acted reasonably when it

approved these procedures.  Accordingly, the EPA did not act arbitrarily and capriciously when

it approved Kentucky's implementation procedures for KPDES permits.

## II. Statute of Limitations under 28 U.S.C. §2401(a)

Intervener-Defendants Associated Industries of Kentucky ("AIK") and the Kentucky

Chamber of Commerce ("KCC") argue in their joint motion that the Plaintiffs' claims as to the

EPA's approval of the domestic sewage provision, the fifty percent (50%) provision and

Kentucky's identification of high quality waters are barred by the six (6) year statute of

limitations in 28 U.S.C. §2401(a).  Waterways counters asserting that because they have

challenged the decisions by the EPA to approve the regulations and not the individual

regulations, the time frame did not start until the EPA made its respected decisions to approve

each aspect of the regulation.

Waterways cites the case of *Northwest Environmental Advocates v. EPA*, where the

District Court of Oregon held that the EPA's alleged failure to exercise its discretionary duty

under the CWA to evaluate antidegradation policy of Oregon was a reviewable agency action

33

under the Administrative Procedure Act. *Northwest Environmental Advocates*, 268 F.Supp.2d at

1264.  In *Northwest Environmental Advocates*, the Court stated:

> Defendants erroneously assert that plaintiff's claim is barred by the relevant six-year
> statute of limitations for review of agency action. 28 U.S.C. § 2401(a).  Because EPA
> approved the plan in 1992, defendants claim that the current challenge is time-barred.
> If plaintiff were challenging the 1992 approval itself, defendants would be correct.
> However, plaintiff challenges EPA's failure to exercise its discretionary duties under
> CWA § 303(c)(4)(B).  DEQ completed its triennial review of its water quality
> standards on January 11, 1996, and submitted its plan to EPA on July 26, 1996. EPA
> 15. On July 22, 1999, EPA rejected certain criteria at which time plaintiff's ability
> to challenge EPA's failure to exercise its discretionary duty "first accrued." This is
> the relevant time-frame from which to evaluate EPA's failure to reject Oregon's
> implementation plan. As such, plaintiff's APA challenge is not time-barred.  The
> entirety of Oregon's "implementation plan" is a one sentence reference to Oregon's
> entire body of water quality standards. The "implementation plan" states merely that
> the standards are "intended to implement the Antidegradation Policy." OAR
> 340-041-0026(1)(a).

*Id.* at 1264-65.  In the instant matter, similar to *Northwest Environmental Advocates*, the

Plaintiffs have challenged the EPA's alleged failure to exercise its discretionary duties under the

CWA.  The EPA began considering the provisions in question in 2004 and 2005, respectively,

well within the six (6) year statute of limitations period.  As such, the claims are not time barred

by 28 U.S.C. §2401(a).

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment is **DENIED**, the

Defendants' Cross-Motions for Summary Judgment are **GRANTED in part** as to the merits of

the eleven (11) Tier II antidegradation procedures in question, and Defendant-Interveners

Associated Industry of Kentucky and Kentucky Chamber of Commerce's joint motion as to the

statute of limitations is **DENIED**.

An appropriate order shall issue.

34